IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 128,008

In the Matter of CAROLYN SUE EDWARDS,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Oral argument held October 31, 2024. Opinion filed December 27, 2024. Six-month suspension.

*Alice L. Walker*, Deputy Disciplinary Administrator, argued the cause, and *Gayle B. Larkin*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*John J. Ambrosio,* of Morris Laing Law Firm, of Topeka, argued the cause, and *Carolyn Sue Edwards,* respondent, argued the cause pro se.

PER CURIAM:  This is an original proceeding in discipline against the respondent, Carolyn Sue Edwards, of Wichita, an attorney admitted to practice law in Kansas in April 1986.

On April 17, 2024, Alice L. Walker, Deputy Disciplinary Administrator, filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). That same day, Walker filed a notice of hearing, confirming that a hearing on the formal complaint was scheduled for June 27, 2024.

1

On May 7, 2024, the respondent, through counsel John J. Ambrosio, filed an answer to the formal complaint. On May 9, 2024, the respondent filed a proposed probation plan.

On June 27, 2024, a panel of the Kansas Board for Discipline of Attorneys held a remote hearing on the formal complaint. The Disciplinary Administrator appeared by video through Walker. The respondent appeared by video with counsel, Ambrosio.

At the beginning of the hearing, the parties confirmed the written stipulation and amended stipulation they filed agreeing that the respondent's conduct in the DA13,809 matter violated KRPC 1.1 (2024 Kan. S. Ct. R. at 324) (competence), KRPC 1.3 (2024 Kan. S. Ct. R. at 328) (diligence), KRPC 1.4 (2024 Kan. S. Ct. R. at 329) (communication), KRPC 1.5 (2024 Kan. S. Ct. R. at 330) (fees), KRPC 1.15 (2024 Kan. S. Ct. R. at 369) (safekeeping property), and KRPC 8.4(c) (2024 Kan. S. Ct. R. at 430) (misconduct involving dishonesty, fraud, deceit, or misrepresentation) and the respondent's conduct in the DA13,937 matter violated KRPC 1.1, KRPC 1.3, KRPC 1.4, KRPC 3.3 (2024 Kan. S. Ct. R. at 387) (candor toward the tribunal), and KRPC 8.4(c).

Upon consideration of the stipulations of the parties and the evidence and argument presented at the hearing, the panel set forth its findings of fact and conclusions of law, along with its recommendation on disposition, in a final hearing report, the relevant portions of which are set forth below.

"*Findings of Fact*

. . . .

2

"14.    In September 2019, the respondent was retained by P.A.C. to represent her in the administration of her father's estate. The scope of representation and fee agreement was not reduced to writing until March 13, 2020.

"15.    P.A.C.'s father passed away on July 31, 2019. He left a will listing P.A.C. as a co-administrator of his estate and one of three beneficiaries to his will and trust. P.A.C.'s mother proceeded her father in death.

"16.    At the beginning of representation, P.A.C. understood the scope of representation to include representing her 'regarding administrative duties as post-death trustee of [her] father's revocable trust, fiduciary of both estates of [her] parents and also possibly in a guardianship for [her] sister, M.A.'

"17.    The respondent viewed the initial scope of work 'to be the probate of the estate and pouring over of various assets into the trust.'

"18.    At the time she retained the respondent, P.A.C. provided the respondent with a copy of her father's will. The original will was provided to the respondent in October 2019.

"19.    The respondent did file initial probate documents on behalf of P.A.C. in both her mother's and father's estate matters in December 2019. These filings contained numerous errors, often interchanging executor and administrator.

"20.    Despite opening estate cases for both P.A.C.'s mother and father, the respondent failed to file the will within the six-month statutory deadline.

"21.    On February 19, 2020, the Sedgwick County District Court Clerk mailed a letter to P.A.C. (no address listed), copying the respondent. The letter indicated that

3

P.A.C. had a duty to file an inventory within thirty (30) days of her appointment as administrator and that to date, no inventory had been filed in her mother's estate case.

"22. On February 11, 2021, the Honorable Judge Robb Rumsey of the Eighteenth Judicial District entered a Notice and Order to Show Cause why P.A.C. should not be removed as administrator due to failure to provide an Inventory and Evaluation by January 27, 2020.

"23. The Notice and Order were mailed to the respondent. The Order further noted that no address for P.A.C. was provided by the respondent.

"24. On March 23, 2021, an inventory for P.A.C.'s mother's estate was filed by the respondent.

"*Failure to Correct Social Security Number*

"25. Early on in the representation, the respondent was made aware that P.A.C.'s father's social security number was incorrectly listed on his death certificate. It was determined the father sometimes used his military ID number for identification, which had been confused for his social security number.

"26. In October 2020, P.A.C.'s husband, D.C., contacted the Kansas Department of Health and Environment (KDHE) seeking guidance on how to correct the death certificate. KDHE relayed that a court order would be required.

"27. On October 5, 2020, D.C. forwarded his e-mail communication with KDHE to the respondent, to which the respondent replied:  'Thanks [D.C.]. I'll file the motion and get moving.'

"28. On October 23, 2020, the respondent emailed P.A.C., stating, 'I have filed the appropriate paperwork to make the change in the Soc. Security number; we don't have the finished product but should before too long.'

4

"29.     On November 18, 2020, D.C. emailed the respondent asking the status of the court motion to correct the death certificate of P.A.C.'s father.

"30.     On December 8, 2020, D.C. again emailed the respondent, saying: 'Forgot to ask about what you found out last week about the motion for correction of the death certificate for the incorrect SSN.'

"31.     On December 11, 2020, the respondent emailed P.A.C. and D.C., stating: 'I do not yet have the order from the probate but have pressed the same with the court.' When the respondent made this statement, no motion or request had been made to the court to correct the death certificate.

"32.     On February 4, 2021, P.A.C. again inquired of the respondent regarding the status of the corrected death certificate, asking:  'What is the status with the correction of the death certificate for the incorrect SSN? . . . The correction of this should open the door to finish the process of transferring the accounts to the trust.'

"33.     A conference call between the respondent, P.A.C. and D.C. occurred on February 13, 2021. During the call, the respondent informed P.A.C., for the first time, of the duty to file an inventory in her mother's estate and that the probate court had signed an order to amend the death certificate.

"34.     At the time of the call, no order had been issued by the Court because no motion to correct the death certificate had been filed by the respondent.

"35.     On March 3, 2021, D.C. notified the respondent by email that he and P.A.C. were still waiting for the corrected death certificate.

"36.     Again, on March 16, 2021, in response to another request for a retainer payment, P.A.C. asked if the respondent received the March 3, 2021, email indicating that they had not gotten the amended death certificate.

"37.     On April 19, 2021, D.C. emailed KDHE inquiring of the status of the amended death certificate based on the information provided to him and P.A.C. by the respondent. D.C. received a response asking for a copy of the court order, as KDHE had not received any such order. This response was forwarded to the respondent seeking a copy of the court order.

"38.     On May 19, 2021, the respondent emailed D.C. and P.A.C. stating she had gotten their calls and emails regarding the court order. She informed them she was not in the office but would respond that afternoon. The respondent did not provide any further response to P.A.C. or D.C.

"39.     On June 23, 2021, P.A.C. emailed the respondent stating she was still waiting for a response from the May 19 email and again seeking information, including information regarding the amended death certificate.

"40.     On Monday, June 28, 2021, the respondent set up a phone call with P.A.C. for Wednesday, June 30. On that date, the respondent's office communicated that the respondent would call P.A.C. on Friday.

"41.     On July 27, 2021, P.A.C. sent the following email to the respondent:

'I have attempted to contact you on number [*sic*] occasions since approximately the end of March 2021, by e-mail and phone, with regards to the status of the [*sic*] getting the court order for the [*sic*] amending the death certificate for [L.A.]. Every time I have called with regards to this with the exception of about two weeks ago, your office secretary or assistant has told me that you are not in the office or are with another client. With regards to the phone call about two weeks ago, you had

6

stated you would contact me on Friday. I am therefore requesting that you present me with a copy of the court order, which according to a conference call approximately the second week of February of this year, was signed by the probate court judge back around approximately the time frame of the first week of February of this year. You stated that I should expect to see the amended death certificate around the middle to end of March of this year. It concerns me greatly that every time I have attempted to contact you about this matter that you have not tried to return my phone calls or reply to my e-mails.'

"42.     The respondent responded that she would like to meet with P.A.C. in the next week to get things done. This meeting did not occur.

"*Failure to Correct Social Security Number*

"43.     In the Fall of 2021, P.A.C. reached out to Tim O'Sullivan to represent her in these matters. Mr. O'Sullivan entered his appearance in the estate matters in February 2022.

"44.     After receiving and reviewing the file from the respondent, O'Sullivan realized L.A.'s original will had never been filed with the probate court.

"45.     On November 19, 2021, P.A.C. submitted a complaint to the disciplinary administrator regarding the representation of her by the respondent in her parents' estate matters. The complaint expressed concerns with not only the handling of the estate matters and lack of communication, but also raised concerns regarding the fee agreement and payments[.]

"46.     The respondent timely responded to the disciplinary complaint by submitting an attorney response on February 11, 2022.

7

"47. P.A.C. paid the respondent $1,000 at the commencement of representation. The respondent placed this payment directly into her operating account.

"48. In her response to the disciplinary complaint, the respondent stated:

'The estate was valued at $1.3 million dollars and I advised them of my hourly fee of $325 an hour, and my estimate that the estate/trust issues would run between $35,000 and $45,000. I discussed a contingent fee agreement with them at that time for the estate alone; they were not sure and wanted to think about it but it was on the table at that time.'

"49. At the commencement of representation, the respondent did not execute a written fee agreement with P.A.C.

"50. In December 2019, P.A.C. made two separate payments to the respondent totaling $17,000.

"51. On December 30, 2019, the respondent emailed P.A.C. stating she: 'Received $13,000.00 today as retainer payment on the estate account. Again, as previously discussed, I believe this matter will run approximately $35,000.00 to $45,000.00, including the conservatorship and the two estates.'

"52. On January 25, 2020, P.A.C. paid the respondent an additional $8,000.00.

"53. In her response to the disciplinary complaint, the respondent explained the scope of representation expanded in the first several months to include: (1) a potential conservatorship for P.A.C.'s sister, M.A.; (2) opening an estate for P.A.C.'s mother, P.A., to transfer property into the trust; (3) reconciling the two different social

8

security numbers for P.A.C.'s father; and (4) addressing concerns of how P.A.C.'s brother, J.A., would spend his share of the estate.

"54.     According to the respondent, P.A.C. and her husband were very concerned with how this increased scope of work would increase the cost of representation from the original quote of $35,000 to $45,000.

"55.     The respondent agreed to cap her fees at 6% of the value of the father's estate, which at the time she believed to be $1.3 million.

"56.     In her attorney response, the respondent asserted that she discussed this with P.A.C. and D.C., and 'they stated they understood, that my fees pursuant to this agreement, that their cost would be no more than the approximate $96,000 (6% of $1.3 million) for all that they had asked me to do.'

"57.     During her interview with the disciplinary investigator, the respondent acknowledged that 6% of $1.3 million would have been $78,000.

"58.     On March 13, 2020, the respondent produced a written fee agreement to P.A.C. The agreement indicated that P.A.C. had paid a fee of '$26,000.00 prior to today's date as a retainer. That amount shall be deducted from any contingency/percentage fee paid by the Client per Section IV of this Agreement.'

"59.     Section IV of the agreement stated:

> 'Percentage Fee. It is understood and agreed that the Client will pay the Attorney the following fee for the Legal Matter to be rendered:  6% of the value of the Estates of [L.A.P.], for all the above matters combined. No additional attorney's fees will be charged for the conservatorship or the trust requirements. Payments on account shall be made as requested by the attorney.'

9

"60.    Following execution of the agreement, the respondent would periodically contact P.A.C. and request additional installment payments. P.A.C. paid these installments as requested in the following amounts:

     a.    $8,000 on March 20, 2020

     b.    $8,000 on June 9, 2020

     c.    $10,000 on July 2, 2020

     d.    $8,000 on July 31, 2020

     e.    $4,500 on September 2, 2020

     f.    $3,000 on October 6, 2020

     g.    $6,500 on October 23, 2020

     h.    $6,500 on December 18, 2020

     i.    $3,500 on March 16, 2021

"61.    P.A.C. paid the respondent a total of $84,000 in legal fees.

"62.    The respondent placed all of these payments directly in her operating account.

"63.    Further, the respondent indicated to the disciplinary investigator that at the time she did not have an attorney trust account.

"64.    The respondent never submitted any of these fee payments to the probate court for approval.

"65.    In her response to the disciplinary complaint, the respondent admitted she should have received court approval for attorney fees.

"66.    The respondent explained in her interview with the disciplinary investigator that 'it was [her] understanding, right or wrong, it was [her] understanding that once a contingent fee agreement is put into place, you can ask for payment and that the fees are earned.'

"67.     The respondent kept some time records at the outset of representation, but she did not continue with those records following the signing of the fee agreement.

"68.     When requesting payments from P.A.C., the respondent did not send an invoice or any accounting explaining the fee request.

"69.     During the disciplinary investigation, and at the request of the disciplinary investigator, the respondent created an invoice for time spent representing P.A.C. The respondent did not keep contemporaneous time records during representation; thus the invoice was an estimation based on file notes, emails, pleadings and other documentation of time spent on the representation. The invoice was estimated using the respondent's hourly rate of $325. The invoice totaled $43,013.75 in professional services rendered. It totaled an additional $943.70 for filing fees, copies, and publications.

"70.     In her attorney response, the respondent indicated that '[i]t is [the respondent's] understanding, as well, that when an attorney's services under a contingent fee contract are no longer required, that the attorney may be entitled to a sum of money commensurate with the reasonable amount of work already provided, based in part on the hourly rate of the attorney.'

"71.     The respondent further indicated in her response that she would 'refund any sum of money the Committee deems proper.'

"72.     As of the date of the hearing, June 27, 202[4], no refund has been provided to P.A.C.

"*DA13,937*

"73.     In April 2022, M.D.C. contacted the respondent's office seeking representation for a stepparent adoption of her daughter. M.D.C. informed the

11

respondent's assistant, Blake Edwards (Blake), that the father of the child, J.S., lived in Europe and she does not have his address.

"74.    On May 6, 2022, M.D.C. and her husband, J.C., retained the respondent to represent them in terminating the parental rights of J.S. and for a stepparent adoption.

"75.    On January 18, 2023, the disciplinary administrator received a complaint from M.D.C. alleging lack of communication and lack of progress in the matter by the respondent.

"76.    The respondent timely responded to the complaint on February 28, 2023.

"77.    The disciplinary investigation revealed errors in the stepparent adoption petitions leading to rejections of the petitions, discrepancies in the respondent's billing practices, misstatements in communications to M.D.C. by the respondent, and inconsistencies in the respondent's answers to the disciplinary investigator.

"*Adoption Petitions*

"78.    On June 24, 2022, the respondent met with M.D.C. and J.C. During this meeting, she requested a copy of the divorce decree for M.D.C. and J.S. The respondent further believed a protection order had been issued against J.S.; thus, the respondent requested a copy of that order as well.

"79.    According to the respondent's attorney response, M.D.C. did not have copies of these orders and was unable to provide the county in which the orders were entered. The respondent and her assistant called several counties trying to locate the divorce decree with no luck.

"80.    At the meeting, M.D.C. and J.C. signed a Petition for Termination of Parental Rights and Adoption. The petition listed Butler County Case Number 2018-DM-000166 as the matter providing primary residential custody to M.D.C.

12

"81.    The petition also asserted that M.D.C. does not know the address, email, or phone number of J.S., only that he resides in Spain. Further, the petition asserted J.S. had only incidental contact with the child, paid child support sporadically, and had been the subject of a protection order filed by M.D.C. in 2018.

"82.    Following the meeting, on the same date, M.D.C. emailed screen shots of her divorce decree involving J.S. to the respondent. The respondent responded:  'Thank you!'

"83.    In her response to the disciplinary complaint, the respondent asserted that after receiving these documents:  'We emailed back saying we could not read it; and got no response nor did we get a clean copy.'

"84.    In her interview with the disciplinary investigator, the respondent acknowledged the case caption of the document clearly stated 'Butler County,' although the case number was difficult to read. The respondent indicated there was no file stamp and she was wanting the final journal entry, so was merely assuming the divorce was final.

"85.    During the disciplinary investigation, the investigator learned that the respondent had email correspondence with M.D.C.'s divorce attorney, Lynette Herman. The respondent explained initially she had forgotten about this contact because she relies heavily on her invoicing, and this communication was not listed on her invoicing. Further, the emails reference a former last name of M.D.C. and therefore did not come up when the respondent searched for correspondence related to this case.

"86.    The contact with Herman showed that on June 29, 2022, the respondent was provided electronic filing notices showing the entry of the final Judgment and Decree of Divorce, a Child Support Worksheet, and Permanent Parenting Plan in Butler County Case 2018-DM-000166.

13

"87.	On June 27, 2022, M.D.C. emailed the respondent informing her that she did not have a protection from abuse order against J.S. The respondent responded: 'Thanks so much.'

"88.	In her response to the disciplinary complaint, the respondent stated that based on this email from M.D.C.: 'At this point I was baffled at the clients' misstatements and differing reports.'

"89.	However, the respondent did not explain this to M.D.C. or change the verified petition prior to filing. Yet, throughout the disciplinary investigation, the respondent referred to the signed statements by M.D.C. as 'patently false.'

"90.	Instead, the respondent asserted in her attorney response that at the end of July 2022 she was waiting for the 'actual divorce case number [. . .] the PFA filing which [she] was wanting to reference in the petition, and (again) the phone records to demonstrate the lack of contact over the past two years. None of this was supplied.'

"91.	On July 26, 2022, M.D.C. emailed the respondent indicating that she and J.C. had moved. She provided the respondent her new address and informed the respondent that she had given J.S. the address via Facebook messenger, who acknowledged the move. In this same email, M.D.C. stated:  'Not sure it matters just letting you know the last time he has spoke [*sic*] to [minor child] and asked to speak to [minor child] was on Father's Day.'

"92.	On August 23, 2022, the respondent filed the Petition signed by M.D.C. and J.C. on June 24, 2022. That same date, the petition was rejected by the court.

"93.	The reason for rejection was noted 'per phone call with Blake.' The respondent explained during the disciplinary investigation that a typographical error regarding the child's last name resulted in the rejection.

14

"94.    The rejection notice was sent to both the respondent and Blake. The respondent did not inform M.D.C. of the filing rejection.

"95.    On August 30, 2022, M.D.C. forwarded a screen shot of a Facebook message to the respondent. The message was received by M.D.C. from J.S. indicating he will be back on September 23 for the foreseeable future. In her email to the respondent, M.D.C. stated: 'I guess he will be back September 24th and doesn't plan to go back.'

"96.    In a subsequent email the same date, M.D.C. asked if 'there is anything visitation wise [M.D.C.] can put in place in the mean time [*sic*] during the court process?'

"97.    On August 31, 2022, the respondent responded, stating: 'We may need to file something to keep him from seeing her; let's talk about that soon.'

"98.    On September 6, 2022, M.D.C. emailed the respondent again asking if there was a time to meet and discuss filing something prior to J.S. returning. The respondent forwarded this message to Blake asking her to set something up.

"99.    On September 13, 2022, the respondent contacted M.D.C. wanting to set up a meeting, as well as requesting an additional $3500 retainer, stating: '[M]y bill is past the retainer at this point.'

"100.    M.D.C. responded that meeting was a good idea and 'would like to look over and talk about what all the retainer has been used for.'

"101.    On September 15, 2022, the respondent again filed the petition for adoption. The respondent utilized the same verified petition signed by M.D.C. and J.C. on June 24, 2022. The respondent made no changes based on the subsequent emails sent by M.D.C.

"102.    That same date, the petition was again rejected by the district court. The reasoning for rejection was listed as:

15

'Good Afternoon and thank you for your e-filing. I need to return this due to the Childs name is different in the header of the documents. The Consent of Natural Mother has the child as [Q.J.C.], the other 3 documents have her as [Q.J.S.]. Her party information lists her as [Q.C.]. Her name needs to be her current legal name on all documents and the party information. Please make changes & re-submit all documents.'

"103.    Again, the rejection notice was sent to the respondent and Blake. Again, the respondent did not notify M.D.C. of the filing rejection.

"104.    On September 20, 2022, M.D.C. responded to her own September 13 email checking in about a meeting to discuss what the retainer had been used for.

"105.    Again on September 25, 2022, M.D.C. contacted the respondent by email, stating:

'Reaching out again because I am really needing to speak to someone asap about what needs to happen and what I can do/say when [J.S.] asks to see [the minor child] so I am prepared. Friday night [J.S.'s family member] messaged me to tell me [J.S.] had just then reached out to him to let him know he was coming back and in his text stated that he was landing sometime on Saturday (09/24). I have not heard from him yet still as of 9/25.'

"106.    On September 27, 2022, the respondent, M.D.C., and J.C. spoke by phone. M.D.C. and J.C. recorded this phone conversation.

"107.    In this phone call, M.D.C. again explained the information she received from [J.S.'s family member] about J.S.'s return. The respondent opined whether she could move up the hearing. She also affirmatively stated that she had 'already given notice as to the date, we've published.' M.D.C. requested a copy of the publication, to which the

16

respondent stated, '[Y]eah, sure, it will probably be tomorrow, Blake is not in today. But yeah, I can send you the notice of publication.'

"108.    At the time the respondent made this statement during the September 27, 2022[,] phone call, no hearing had been set due to the rejection of the filings. In addition, the respondent had not published any notice for the same reason.

"109.    During a third interview with the disciplinary investigator, the respondent was asked specifically about the recorded phone call. The respondent could not fully explain why she told her clients publication had occurred. The respondent indicated she had been told by her assistant it had been filed, that she recalled telling her assistant to get it published, and that she must have been thinking that it had been done.

"110.    On September 28, 2022, Blake reached out to M.D.C. and J.C. explaining she had been out of the office and was told by the respondent an appointment had been set up for them to come in, but Blake needed to confirm the date and time. J.C. responded that no appointment had been set up.

"111.    On October 13, 2022, the respondent again filed the petition for adoption.

"112.    At this time, the Honorable Judge Richard Macias called the respondent regarding the pleadings. In this conversation, Judge Macias discussed concerns with due diligence in publication of service and questioned child support payments based on information he was able to retrieve from public Kansas Payment Center records. Judge Macias told the respondent he was going to reject the pleadings and gave her the opportunity to adjust the petition and refile.

"113.    The petition was officially rejected, and the respondent received notice via email.

17

"114.    The respondent did not notify M.D.C. of the rejection or the concerns of Judge Macias.

"115.    The next documented communication came from M.D.C. on October 17, 2022, when she indicated she could drop off money the following day. The respondent responded asking M.D.C. to call ahead to ensure someone was at the office.

"116.    On November 4, 2022, M.D.C. again emailed regarding dropping off money and asking about information regarding a home inspection. M.D.C. asked: 'Is there still time before our court date on Wednesday?'

"117.    Blake responded to this email indicating there was an update on the case and wanting to set up a phone call the following day.

"118.    On November 4, 2022, M.D.C. texted her sister following a conversation with the respondent. The text messages indicate that M.D.C. learned that the judge hearing the adoption matter wanted more due diligence to serve J.S. The text message further explained that the respondent suggested to M.D.C. to change the legal approach to seek sole custody in the domestic case before pursuing adoption.

"119.    On November 20, 2022, M.D.C. contacted the respondent by email asking if the motion was ready for review.

"120.    After no response, and due to frustrations with representation, M.D.C. and J.C. decided to terminate the respondent's representation of them.

"121.    On November 25, 2022, J.C. called the respondent seeking a refund of the $2,000 paid in October and November. A refund was issued by the respondent on November 28, 2022.

"122.    M.D.C. contacted the respondent three times by email seeking her case file between November 2022 and January 2023. Finally, on January 31, 2023, the

18

respondent responded saying the file was too large to scan and it had been placed in the mail.

"123.    On February 7, 2023, M.D.C. emailed indicating she had received the mailed documents but did not have the initial pleadings, updated pleadings, publication, or case number and was requesting those documents from the respondent.

"124.    In the disciplinary investigation, the respondent indicated she had provided M.D.C. with everything in the client file, including work product notes, and there was nothing additional to provide.

"*Fee Agreement*

"125.    On May 6, 2022, M.D.C. paid the respondent $3,500. The respondent did not execute a written fee agreement with M.D.C. at the commencement of representation.

"126.    J.C.'s employer provided reimbursement for legal expenses. On May 19, 2022, M.D.C. emailed Blake indicating J.C.'s employer was requesting an invoice for the retainer payment of $3,500.

"127.    Blake responded on May 23, 2022, that she would provide an invoice on Wednesday.

"128.    On July 11, 2022, J.C. notified the respondent that his benefit provider needed a copy of 'the document showing [J.C. and M.D.C.] signed with [the respondent] to represent [J.C. and M.D.C.] in the adoption case.'

"129.    The respondent responded the same date stating:  'I don't think we executed a formal fee agreement other than through email, but I can draft that and we can sign it.'

19

"130.    The respondent created a fee agreement and back dated it to May 6, 2022. The agreement outlined that 'the hourly rate of Attorney Carolyn Sue Edwards is $325.00 per hour, with minimum billing for phone calls and emails at 2/10th's of an hour minimum; and $95.00 an hour for paralegal time, billed in minimum $15.00 minute [*sic*] increments.' The agreement further indicated '[t]he parties acknowledge the retainer payment of $3500.00 made by the parties of the second part and received by the party of the first part, for commencement of the legal work to be undertaken.'

"131.    During the disciplinary investigation, the respondent confirmed that no prior email communication occurred regarding a fee agreement. Instead, the only prior communication was when Blake quoted M.D.C. and J.C. an estimate during their initial phone conversation in April 2022.

"132.    On September 13, 2022, the respondent contacted M.D.C. requesting an additional $3,500 retainer stating:  '[M]y bill is past the retainer at this point.'

"133.    M.D.C. responded, stating she 'would like to look over and talk about what all the retainer has been used for.'

"134.    Following this request from the clients the respondent produced an invoice dated October 6, 2022, showing use of the retainer.

"135.    In the disciplinary investigation, the respondent was unclear on the request for additional funds, explaining that it was based on potentially going to trial or switching gears to seeking sole custody rather than continuing to pursue the adoption case.

"136.    Throughout the disciplinary investigation, the respondent's recollection of events during the representation of M.D.C. changed, and at times, the respondent provided explanations that were inconsistent with the clear evidence obtained by the disciplinary investigator. This included disagreeing with what was stated in the recorded phone call between the respondent and her client on September 27, 2022. Due to these

20

discrepancies, the disciplinary investigator conducted three separate interviews and requested two additional responses from the respondent.

"137.    The parties stipulated that the respondent violated the following rules in the DA 13,809 matter:  KRPC 1.1 (competence); 1.3 (diligence); 1.4 (communication); 1.5 (fees); 1.15 (safekeeping property); and 8.4(c) (misconduct).

"138.    The parties also stipulated that the respondent violated the following rules in the DA 13,937 matter:  KRPC 1.1 (competence); 1.3 (diligence); 1.4 (communication); 3.3 (candor toward the tribunal); and 8.4(c) (misconduct).

"139.    During the formal hearing, the respondent testified on topics relevant to mitigation. The respondent testified about horrific physical, sexual, and emotional abuse inflicted on her for years by adult members of her family. The hearing panel will not elaborate on the details of this testimony here out of respect for the respondent's privacy; however, the panel fully understands the magnitude of the impact this abuse may have had on the respondent.

"140.    Through the testimony of the respondent and her therapist, Dr. Michael Leahy, after the trauma she endured in childhood, the respondent has been diagnosed with PTSD, depressive disorder, and anxiety. The respondent testified that her mental health conditions have caused her to feel as though she is walking 'up to her nostrils' through molasses, making it difficult to accomplish all necessary tasks. She also testified that she has experienced suicidal ideations, fugue states, and panic attacks.

"141.    The respondent testified that, (a) she was conditioned as a child by her abusers to avoid unpleasant topics and maintain a facade that all was well; (b) as a result, as an adult she has a very difficult time disappointing people, including clients, or confronting unpleasant truths; and (c) as a result, she misled her clients in the two matters at issue here to avoid admitting that she did not perform the tasks she promised them she would do.

21

"142. After her diagnosis, the respondent has worked with her physician for months trying different combinations of medications to address her mental health conditions. She testified that she has finally found a combination of medications that work for her. She further testified that her depressive disorder has lifted, her mood is lighter, she feels happy, and is sleeping well.

"143. The respondent testified that one of the medications the respondent tried but that did not work for her was Klonopin. The respondent tried this medication through May 2023, which was the timeframe she was meeting with disciplinary investigators in these matters. Director of Investigations Crystalynn Ellis testified that, after three interviews with the respondent, Ms. Ellis was left with the impression that the respondent's inaccurate statements during the investigation reflected confusion and the respondent's inability to process information as opposed to intent to mislead. The respondent and Dr. Leahy both testified that a common side effect of Klonopin is memory loss, which the respondent said she experienced while on this medication.

"144. Dr. Leahy added that at the time of her misconduct, the respondent experienced a 'perfect storm' of substantial stressors including: the COVID pandemic, which presented economic stress as a solo practitioner and the respondent was at high risk for severe illness; loss of a close friend who she lived with to cancer; her colleague and mentor retired from the practice of law; and her adult sons moved to California, one of whom became estranged from her and her family.

"145. In addition to taking the above-mentioned medication, the respondent testified that she regularly attends therapy with Dr. Leahy, participates in a women's sexual assault group, participates in the KALAP resiliency group, and has a KALAP monitor.

"146. The respondent also has strong, consistent support from her proposed practice supervisor under her probation plan, Charles Harris. Mr. Harris testified that he has retired from practicing as an attorney but maintains an active law license, that he is ready and willing to supervise the respondent for the three years proposed in her

22

probation plan, and that he is fully aware of the complaints in this matter and the issues the respondent is dealing with, including her prior dishonesty and her mental health diagnoses.

"147.   Mr. Harris has been meeting with the respondent every week for 60-90 minutes since February 2, 2024. They meet at the respondent's office. Mr. Harris suggested to the respondent that she limit her practice to Sedgwick County, and not have cases in other counties to avoid extra travel time, having to learn various local court rules, and monitoring numerous court dockets. The respondent has taken this advice and, as of the date of the hearing, had only two cases pending in counties other than Sedgwick County. Mr. Harris has gone over the respondent's timekeeping and billing practices, and he monitors whether she is timely responding to discovery, motion, and other filing deadlines. He testified that since he began working with the respondent, she missed one court appearance, but called the judge and opposing counsel afterward and got the matter rescheduled without issue.

"148.   Mr. Harris testified that the respondent can call him anytime 24-7 with any issues in her law practice, and that the respondent has been willing to let him look at anything in her files that he asks to see.

"*Conclusions of Law*

"149.   Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.1 (competence); 1.3 (diligence); 1.4 (communication); 1.5 (fees); 1.15 (safekeeping property); 3.3 (candor toward the tribunal); and 8.4(c) (misconduct involving dishonesty, fraud, deceit, or misrepresentation), as detailed below.

23

"KRPC 1.1

"150.     Attorneys must provide competent representation to their clients. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' KRPC 1.1.

"151.     The respondent failed to file the will in the probate matter for client P.A.C. in DA 13,809 within the statutorily required six (6) months. Further, the exhibits show numerous errors in the probate filings. In addition, the respondent failed to take action to obtain an order to correct the social security number on P.A.C.'s father's death certificate.

"152.     The respondent made repeated errors in the DA 13,937 matter, many of which were fatal to getting the adoption petition filed and caused it to be repeatedly rejected by the district court.

"153.     The respondent stipulated that her conduct violated KRPC 1.1.

"154.     Accordingly, the hearing panel concludes that the respondent violated KRPC 1.1.

"KRPC 1.3

"155.     Attorneys must act with reasonable diligence and promptness in representing their clients.

"156.     The respondent failed to diligently and promptly represent P.A.C. in the DA 13,809 matter by failing to promptly file P.A.C.'s father's will within the statutory deadline and failing to timely address the issue of the father's incorrect social security number on his death certificate.

24

"157.    The respondent failed to diligently and promptly represent M.D.C. in the DA 13,937 matter by failing to properly input information in the adoption petition to get it filed, failing to timely obtain accurate information from M.D.C. and public information resources to put in the petition, and failing to timely correct errors in the petition to get it filed. Further, the respondent did not take appropriate measures to attempt to serve the biological father with the petition for stepparent adoption.

"158.    The respondent stipulated that her conduct violated KRPC 1.3.

"159.    Accordingly, the hearing panel concludes that the respondent violated KRPC 1.3.

"KRPC 1.4

"160.    KRPC 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' Further, according to KRPC 1.4(b), '[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.'

"161.    The respondent failed to fully inform her client P.A.C. in the DA 13,809 matter of P.A.C.'s duty to file an inventory in the probate matter for a full year. Further, the respondent did not communicate accurate information to P.A.C. about the respondent's attempts (or lack thereof) to correct P.A.C.'s father's social security number on his death certificate. P.A.C. and her spouse were forced to contact the Kansas Department of Health and Environment themselves and thereby learned that the respondent had done nothing to correct the death certificate. There were periods of time when the respondent did not respond to requests for information from P.A.C. at all.

"162.    The respondent repeatedly failed to respond to requests for information about the adoption case in the DA 13,937 matter from M.D.C. or her spouse. Further, the respondent failed to fully inform M.D.C. of the status of the adoption case, i.e., that the

25

respondent had not been able to get the adoption petition filed due to the respondent's errors. Instead, the respondent led the clients to believe that the petition had been filed, publication service had been established, and a hearing was set, when none of this had occurred.

"163. The respondent stipulated that her conduct violated KRPC 1.4.

"164. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.4.

"KRPC 1.5

"165. KRPC 1.5(a) provides that '[a] lawyer's fee shall be reasonable.'

"166. In the DA 13,809 matter, the respondent charged, and P.A.C. paid the respondent, $84,000.00 in return for the respondent providing very little service to P.A.C. in the probate matter. The respondent failed to notify P.A.C. of her statutory duty to file an inventory, failed to take any action to obtain a court order to correct P.A.C.'s father's social security number on his death certificate, and failed to complete the other services agreed to by the parties.

"167. Further, the respondent did not obtain court approval of her attorney fee as required by statute for such probate matters.

"168. The respondent stipulated that her conduct violated KRPC 1.5.

"169. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.5.

26

"170.    Lawyers must properly safeguard their clients' property. KRPC 1.15(a) specifically provides that:

> '(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state of Kansas. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.'

"171.    In this case, the respondent failed to properly safeguard P.A.C.'s property in the DA 13,809 matter by failing to deposit the unearned fees into an attorney trust account. Rather, the respondent admitted that she did not have a trust account and she deposited the unearned fees directly into her operating account.

"172.    The respondent stipulated that her conduct violated KRPC 1.15.

"173.    Accordingly, the hearing panel concludes that the respondent violated KRPC 1.15.

"KRPC 3.3

"174.    KRPC 3.3(a) provides:

> 'A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.'

"175. In the DA 13,937 matter, in August 2022, the respondent filed a version of the adoption petition maintaining within it that there was a protection from abuse order against J.S. despite the fact that the respondent had been notified on June 27, 2022, by M.D.C. that there was no protection order. Further, the respondent filed the same adoption petition three times without changing information within to comport with new information she had learned from her clients in the meantime. The respondent indicated during the disciplinary investigation that she believed information provided to her by her clients was false but then included that same information in the adoption petition.

"176. The respondent stipulated that her conduct violated KRPC 3.3.

"177. Accordingly, the hearing panel concludes that the respondent violated KRPC 3.3.

28

"KRPC 8.4(c)

"178.    'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c).

"179.    The respondent engaged in conduct involving misrepresentation and dishonesty in the DA 13,809 matter when she told her clients she had taken certain actions in the probate representation, including that she had taken action to obtain a court order to get P.A.C.'s father's social security number corrected on his death certificate, when she had not.

"180.    The respondent engaged in conduct involving misrepresentation and dishonesty in the DA 13,937 matter when she told her clients she had filed the adoption petition, she had obtained publication service, and a hearing had been set, when none of this had occurred.

"181.    The respondent stipulated that her conduct violated KRPC 8.4(c).

"182.    Accordingly, the hearing panel concludes that the respondent violated KRPC 8.4(c).

"*American Bar Association Standards for Imposing Lawyer Sanctions*

"183.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"184.    *Duty Violated*. The respondent violated her duty to her clients.

29

"185.    *Mental State*. The respondent knowingly violated her duty.

"186.    *Injury*. The respondent's misconduct caused significant delay in the clients' cases in both the DA 13,809 matter and the DA 13,937 matter. Further, the respondent's misconduct caused the client in the DA 13,809 matter to pay an unreasonable fee, with no refund for the client to use to hire subsequent counsel. Finally, the respondent's misconduct negatively impacted her clients' trust in the respondent.

"187.    In addition to the above-cited factors in Standard 3, the hearing panel has thoroughly examined and considered the following Standards:

'4.12    Suspension is generally appropriate when a lawyer knows or should know that he [or she] is dealing improperly with client property and causes injury or potential injury to a client.'

'4.42    Suspension is generally appropriate when:

'(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

'(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.'

'4.43    Reprimand is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.'

'4.53    Reprimand is generally appropriate when a lawyer:

'(a) demonstrates failure to understand relevant legal doctrines or procedures and causes injury or potential injury to a client; or

30

'(b) is negligent in determining whether he or she is competent to handle a legal matter and causes injury or potential injury to a client.'

'4.62   Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client.'

'4.63   Reprimand is generally appropriate when a lawyer negligently fails to provide a client with accurate or complete information, and causes injury or potential injury to the client.'

'5.13   Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.'

'6.12   Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.'

'6.13   Reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false or in taking remedial action when material information is being withheld and causes injury or potential injury to a party to the legal proceeding, or

causes an adverse or potentially adverse effect on the legal proceeding.'

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.'

'7.3    Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.'

"Aggravating and Mitigating Factors

"188.    Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following with regard to aggravating factors:

"189.    *Prior Disciplinary Offenses*. The respondent has been previously disciplined on two occasions. In 1999, the respondent received an informal admonition for violation of KRPC 1.3 and 1.4. In 2019, the respondent entered into a diversion agreement for violation of KRPC 1.4 and 1.5. This is an aggravating factor.

"190.    *Pattern of Misconduct*. There is a pattern of misconduct between the DA 13,809 matter and the DA 13,937 matter. In both cases, the respondent showed issues with competence, diligence, and communication. Further, the respondent was dishonest with her clients in both cases. This is an aggravating factor.

32

"191.    *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1986. At the time of the misconduct, the respondent had been practicing law for over 34 years. The hearing panel concludes that the respondent had substantial experience in the practice of law when the misconduct occurred and that this is an aggravating factor.

"192.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"193.    *Absence of a Dishonest or Selfish Motive*. Other than her repeated requests for additional payments from her clients for work that had been performed incorrectly or that had not been completed, the respondent's misconduct does not appear to have been motivated by dishonesty or selfishness. While the respondent's conduct involved dishonesty to her clients, the hearing panel concludes that her misconduct was the result of her mental health diagnoses and, except as noted above, not out of a motive for personal gain. This is a mitigating factor.

"194.    *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct*. The respondent experienced a large number of substantial personal and emotional problems during the several-year period that the misconduct occurred, as described in the findings of fact section above. Dr. Leahy described it as the 'perfect storm' of substantial stressors, which included the COVID pandemic, presenting economic stress and her high risk for severe illness; loss of a close friend who she lived with to cancer; her colleague and mentor retiring from the practice of law; and her adult sons moving to California, one of whom became estranged from her and her family. It appears that these problems, combined with her mental health condition at the time, contributed to her misconduct. This is a mitigating factor.

"195.    *Timely Good Faith Effort to Make Restitution or to Rectify Consequences of Misconduct*. The respondent refunded the fee paid to her by M.D.C. and her spouse.

33

The respondent's effort to make restitution and resolve the consequences of her misconduct in the DA 13,937 matter is a mitigating factor.

"196.    *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions*. The respondent has cooperated in the disciplinary process, as evidenced in part by her entry into a joint stipulation to facts and that her conduct violated KRPC 1.1, 1.3, 1.4, 1.5, 1.15, 3.3, and 8.4(c). The hearing panel concludes that this is a mitigating factor.

"197.    *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is an active and productive member of the bar in Sedgwick County, Kansas. The respondent also enjoys the respect of her peers as shown by the testimony of Mr. Harris and letters received by the hearing panel. The hearing panel concludes that this is a mitigating factor.

"198.    *Mental Disability or Chemical Dependency Including Alcoholism or Drug Abuse*. The respondent is diagnosed with PTSD, depressive disorder, and anxiety. The respondent testified that her mental health conditions have caused her to feel as though she is walking 'up to her nostrils' through molasses, making it difficult to accomplish any necessary tasks. She also testified that she has experienced suicidal ideations, fugue states, and panic attacks. The respondent is working diligently to address these conditions, including taking medication, attending therapy and support groups, and seeking support through KALAP. The respondent reports she is doing much better with all of these supports in place. This is a mitigating factor.

"199.    *Remoteness of Prior Offenses*. The informal admonition received by the respondent in 1999 was remote in time to the current misconduct. This is a mitigating factor.

34

"200.    The disciplinary administrator recommended that the respondent's license be suspended for a period of six months. The disciplinary administrator further recommended that the respondent be required to undergo a reinstatement hearing under Rule 232.

"201.    The respondent recommended that she be suspended for three years, with an immediate stay of the suspension while the respondent is placed on probation for three years according to the terms of her proposed probation plan.

"*Discussion*

"202.    When a respondent requests probation, the hearing panel is required to consider Rule 227, which states:

'(d)    Restrictions on Recommendation of Probation. A hearing panel may not recommend that the respondent be placed on probation unless the following requirements are met:

(1)    the respondent complies with subsections (a) and (c) and the proposed probation plan satisfies the requirements in subsection (b);

(2)    the misconduct can be corrected by probation; and

(3)    placing the respondent on probation is in the best interests of the legal profession and the public.'

"203.    The hearing panel concludes that the respondent complied with Rule 227(a) and (c) by filing and serving her proposed probation plan as required in subsection

35

(a) and complying with each condition of the plan for at least 14 days prior to the formal hearing.

"204. Rule 227(b) requires that the probation plan meet the following requirements:

'(1) be workable, substantial, and detailed;

(2) contain adequate safeguards that address the professional misconduct committed, protect the public, and ensure the respondent's compliance with the Kansas Rules of Professional Conduct, the Rules Relating to Discipline of Attorneys, and the attorney's oath of office;

(3) include the name of a practice supervisor if practice supervision is proposed; and

(4) include a provision that the respondent will not commit misconduct.'

"205. The respondent's proposed probation plan is workable, substantial, and detailed. The plan contains a provision that the respondent will not commit misconduct. The respondent names Mr. Harris as her practice supervisor, and Mr. Harris's commitment and aptitude for serving as her practice supervisor was apparent to the hearing panel through his testimony. Mr. Harris is committed to helping the respondent stay on track, not violate the KRPC again, and perform well as a lawyer. Rule 227(b)(1), (3), and (4) are met here.

"206. The safeguards listed in the probation plan are adequate to address the professional misconduct committed, protect the public, and ensure the respondent's compliance with the rules. The hearing panel concludes that Rule 227(b)(2) is satisfied, and that the hearing panel may recommend the respondent be placed on probation.

36

"207.    However, the hearing panel believes that the respondent and the public will be better served if Mr. Harris's supervision of the respondent does not taper off over the three years as proposed in her probation plan. The hearing panel recommends that Mr. Harris continue to meet with the respondent on a weekly basis throughout the three-year duration of the plan. Further, the hearing panel recommends that Mr. Harris periodically audit the respondent's communications with her clients to ensure that what the respondent reports to Mr. Harris and to her clients is accurate. The hearing panel believes that this added verification will provide further protection against possible mental health setbacks that may cause forgetfulness or temptation to conceal a mistake.

"208.    The respondent testified that she has approximately $20,000 in her attorney's trust account to use to refund to P.A.C. once she knows how much she needs to pay to P.A.C. The hearing panel further recommends that the respondent be required to enter into a repayment plan to provide complete restitution to P.A.C. and J.C. in the amount of $40,986.25. This restitution amount represents the $84,000.00 paid to the respondent by P.A.C. and J.C. minus the amount of fees the respondent was able to retroactively ascertain was earned through legal services provided and expenses incurred in the case.

"*Recommendation of the Hearing Panel*

"209.    Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent's license be suspended for a period of three years. The hearing panel further recommends that the three-year suspension be stayed and the respondent be placed on probation for a period of three years under the terms of her proposed probation plan and the additional terms recommended by the hearing panel in the Discussion section above.

"210.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator. Dated this 2nd day of August, 2024."

37

In a disciplinary proceeding, the court considers the evidence, the panel's findings, and the parties' arguments to determine whether KRPC violations exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Murphy*, 312 Kan. 203, 218, 473 P.3d 886 (2020); see Supreme Court Rule 226(a)(1)(A) (2024 Kan. S. Ct. R. at 279). "'Clear and convincing evidence is "evidence that causes the factfinder to believe that 'the truth of the facts asserted is highly probable.'"'" *In re Murphy*, 312 Kan. at 218.

The respondent was given adequate notice of the formal complaint, to which she filed an answer. The respondent filed no exceptions. Therefore, the panel's factual findings are considered admitted. Supreme Court Rule 228(g)(1), (2) (2024 Kan. S. Ct. R. at 285). The evidence also supports the panel's conclusions of law finding clear and convincing evidence supported the charged misconduct under KRPC 1.1 (2024 Kan. S. Ct. R. at 324) (competence), KRPC 1.3 (Kan. S. Ct. R. at 328) (diligence), KRPC 1.4 (2024 Kan. S. Ct. R. at 329) (communication), KRPC 1.5 (2024 Kan. S. Ct. R. at 330) (fees), KRPC 1.15 (2024 Kan. S. Ct. R. at 369) (safekeeping property), KRPC 3.3 (2024 Kan. S. Ct. R. at 387) (candor toward the tribunal), and KRPC 8.4(c) (2024 Kan. S. Ct. R. at 430) (misconduct involving dishonesty, fraud, deceit, or misrepresentation). We therefore adopt the panel's findings and conclusions.

The only remaining issue is to determine the appropriate discipline for the respondent's violations. The hearing panel followed the respondent's recommendation that she be suspended for three years, with an immediate stay of the suspension while the respondent is placed on probation for three years. The Disciplinary Administrator

recommended that the respondent's license be suspended for six months and that she be required to undergo a reinstatement hearing under Rule 232 (2024 Kan. S. Ct. R. at 290).

This court is not bound by the recommendations made by the hearing panel or the Disciplinary Administrator. *In re Malone*, 316 Kan. 488, 499, 518 P.3d 406 (2022). After carefully considering the evidence presented, as well as the ABA Standards for Imposing Lawyer Sanctions, the court follows the recommendations of the Disciplinary Administrator to suspend the respondent's license for six months and require her to undergo a reinstatement hearing under Rule 232.

In adopting the discipline recommended by the Disciplinary Administrator's office, we considered the mitigating factors, including mental disability and emotional trauma contributing to the respondent's violations, good faith efforts to make restitution in DA13,937, cooperation with the disciplinary process, acknowledgment of wrongdoing, genuine remorse, previous good character and reputation in the legal community, and remoteness of prior offenses.

Even so, we cannot overlook the fact that the respondent's misconduct caused actual harm to her former clients. In the DA13,809 matter, the respondent knowingly failed to file the will for probate within the six-month statutory deadline, placing the probate process in peril. The client became aware of the respondent's failure only after her newly retained attorney discovered the respondent had never filed the will for probate, which was over a year after the six-month deadline had passed. The respondent also failed to file the required inventory before the 30-day deadline. The district court sent a letter to the respondent shortly after the deadline expired notifying her of this failure and advising that a copy of the letter had not been sent to the administrator (the respondent's client) because the respondent had not provided the necessary contact

information. Yet respondent knowingly did not provide the contact information, did not advise her client of the letter, and did not file the required inventory. Over a year after the 30-day deadline expired, the court issued an order for the client to show cause why she should not be removed as administrator for failing to file the inventory. It was only after having the show cause order issued that the respondent advised her client of her failure to file the required inventory. The respondent also failed to file the legal pleadings necessary to correct the incorrect social security number listed on the death certificate. When asked by the client about the status of the social security number correction, the respondent knowingly told her client that she would press the court for a ruling even though the respondent knew she had never filed a motion or request with the court to correct the death certificate. Finally, the respondent caused the client to pay an unreasonable fee of $84,000, and has failed to provide any refund, even though the respondent knew the client had to hire subsequent counsel to provide the legal services the respondent failed to deliver in the 18 months she represented the client.

In the DA13,937 matter, the respondent told her clients by telephone that the adoption petition had already been filed, the hearing date set, and that publication had occurred, even though the respondent knew the filing was rejected almost two weeks before the phone call. Although the adoption petition was rejected two more times after this phone call, the respondent never advised her clients of this fact. It was only after the clients emailed the respondent a week before the fabricated hearing date that the respondent told them the judge had concerns over the stepparent adoption. The respondent suggested a motion to modify custody might be a better option. When the respondent failed to follow up on this motion, the clients terminated the respondent's representation. Although the clients contacted the respondent two times by email over a two-month period seeking the case file, the respondent failed to respond even though she knew the client had to hire subsequent counsel to provide the legal services the

40

respondent failed to deliver. After three months, the respondent finally responded to another request and the clients received some documents in the mail a week later. Upon review, the clients emailed the respondent advising that the mailed documents did not have the initial pleadings, updated pleadings, publication, or a case number and requested those documents from the respondent. It was only after disciplinary proceedings were initiated that the clients discovered no petition or other pleadings had been filed and publication had never occurred.

While the respondent has made notable strides in understanding and addressing the personal issues that led to the ethical lapses and serious rule violations resulting in this complaint, there is clear and convincing evidence here to establish she knowingly engaged in much of the misconduct as found by the panel. The ABA Standards for Imposing Lawyer Sanctions differentiates between a lawyer's knowing misconduct on the one hand and a lawyer's negligent misconduct on the other. Compare ABA Standard 4.42 (Suspension is generally appropriate when a lawyer *knowingly* fails to perform services for a client and causes injury or potential injury to a client.) and ABA Standard 4.62 (Suspension is generally appropriate when a lawyer *knowingly* deceives a client, and causes injury or potential injury to the client.) with ABA Standard 4.43 (Reprimand is generally appropriate when a lawyer is *negligent* and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.) and ABA Standard 4.63 (Reprimand is generally appropriate when a lawyer *negligently* fails to provide a client with accurate or complete information, and causes injury or potential injury to the client.). This supports our decision to follow the recommendations of the Disciplinary Administrator to suspend the respondent's license for six months and require her to undergo a reinstatement hearing.

Although the respondent's recommendation also includes a suspension component, she endorses a substantially longer period of suspension than that recommended by the Disciplinary Administrator and urges the court to stay the suspension while she is placed on probation for three years. As a general rule, however, this court is "reluctant to grant probation where the misconduct involves fraud or dishonesty because supervision, even the most diligent, often cannot effectively guard against dishonest acts." *In re Stockwell*, 296 Kan. 860, 868, 295 P.3d 572 (2013); see Rule 227 (2024 Kan. S. Ct. R. at 280) (requiring probation plans to provide adequate safeguards to protect against the misconduct).

For the reasons stated above, we decline to follow the hearing panel's recommendation that the respondent be suspended for three years, with an immediate stay of the suspension while the respondent is placed on probation for three years. Based on the evidence presented in this particular case and the ABA Standards for Imposing Lawyer Sanctions, we order the respondent's license be suspended for a period of six months and require her to undergo a reinstatement hearing under Rule 232.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Carolyn Sue Edwards is suspended for six months from the practice of law in the state of Kansas, effective from the date this opinion is filed.

IT IS FURTHER ORDERED that the respondent must undergo a reinstatement hearing under Rule 232.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.